# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **GERALD LYNN BOSTOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO: 1:16-cv-01460-ELR-WEJ** |
| **CLAYTON COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

In his initial brief, Mr. Bostock established that he is entitled to judgment as a matter of law on the issue of liability and this case should proceed to a jury trial on the sole issue of damages. Defendant's response in opposition is most notable for what it fails to address: the fact that Teske admitted under oath that Mr. Bostock's sexuality was a "contributing factor" in Teske's decision to terminate Mr. Bostock. (Teske Depo. 177:22-178:20.) This glaring omission of a pivotal fact by Defendant speaks volumes. In the face of this undisputed and unambiguous sworn testimony, there is no context for Defendant to attempt to explain away and no other interpretation beyond what Teske admitted: he fired Mr. Bostock because he is gay.

1

Although the record contains abundant additional evidence of discrimination, this statement alone is enough to require summary judgment in Plaintiff's favor.

What Defendant does actually include in its response fares no better. As set forth below, Defendant has mischaracterized or misstated the record concerning numerous items including further discriminatory statements and actions by Teske and others, the nature of the GAL funds, the plain language of the MOU, and Mr. Bostock's recruiting success. Mr. Bostock is entitled to summary judgment on the issue of liability and this case should proceed to trial on the sole issue of damages.

## II.     ARGUMENT AND CITATION OF AUTHORITY

### A. Plaintiff is Entitled to Summary Judgment Based on Direct Evidence of Discrimination

In his initial brief, Mr. Bostock established that there is direct evidence of discrimination in the sworn testimony of Teske, the undisputed decisionmaker in Mr. Bostock's termination. Teske admitted under oath that Mr. Bostock's sexual orientation was a "contributing factor" in his decision to terminate Mr. Bostock. (Teske Dep. 177:22-178:20.) "There is not the slightest subtlety or ambiguity in this statement, and it falls easily within the 'most blatant' of remarks." *Wheat v. Rogers & Willard, Inc.*, 271 F. Supp. 3d 1327, 1331 (S.D. Ala. 2017).

Defendant, however, *completely ignores* this undisputed statement and instead argues that Teske's other statements are not direct evidence and that they in fact disclaim any discriminatory motive. This tortured reading is simply unstainable as a matter of fact and law.

First, Defendant, ignores that fact that Teske's testimony and diary statements concerning Mr. Bostock's sexuality are directly tied to his reason for terminating Mr. Bostock. *See EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923–24 (11th Cir.1990) (general manager's remark that "if it was his company, he wouldn't hire any black people," constituted direct evidence of discriminatory motive in failing to promote black employee when general manager was responsible for promotion decisions at issue) Teske said as much in the testimony Defendant ignores. But that is certainly not the only instance.

 Teske characterized Midtown Atlanta as "the gay district of Atlanta." (Teske Depo. 176:24-177:13; Exhibit 43 at 11). Teske was suspicious of Mr. Bostock's spending in Midtown "because [Mr. Bostock] is gay." Thus, by Teske's own admission, his alleged "suspicions" of Mr. Bostock's spending to recruit and retain volunteers for the CASA program  - the entire basis of the audit - were "*because* [Mr. Bostock] is gay." (*Id.*)  But for Mr. Bostock's sexuality, not only would Teske not have fired him, but Mr. Bostock never would have come under Teske's

3

discriminatory "suspicion" in the first place.

Teske factored Mr. Bostock's sexual orientation into his conclusion that Mr. Bostock was spending money on "personal things" in Midtown Atlanta. (Teske Depo. at 182:3–25). Thus, Defendant simply ignores the plain fact that all of Teske's suspicions were based around a protected trait – Plaintiff's sexuality.

Defendant defies logic by arguing that "knowledge that many of these midtown Atlanta establishments advertised themselves as gay-friendly, and that Plaintiff also is gay, reinforced the already reasonable, common-sense suspicion that Plaintiff was just going out to bars and restaurants near where he lived and dishonestly claiming to have been 'recruiting' Clayton County CASA GAL volunteers." (Doc. 154 at 6.)  Thus, Defendant's *own argument* concedes that Mr. Bostock's sexuality was a factor in "reinforcing" Teske's discriminatory suspicion. In other words, as Teske himself admitted, Mr. Bostock's sexuality was "a contributing factor" in his decision to terminate Mr. Bostock.[1]

---

[1] Moreover, Mr. Bostock was not living in Midtown Atlanta at this time nor did Teske ever even reference this in his deposition or anywhere else in the record. Mr. Bostock testified that he would regularly stay the night at an individual's townhome "towards the end" of their relationship which ended in April of 2012, over a year before the audit. (Bostock Depo. at 71:11–22; Holland Depo. (Doc. 142-10) 12:18-25.)

Defendant speciously argues that Teske disclaimed a discriminatory motive and that "for a jury to find Judge Teske's statements to be direct evidence of sexual-orientation discrimination, the jury at least would have to make the additional inference or presumption that Judge Teske did not mean what he said when he expressly disclaimed having an anti-gay discriminatory motive." (Doc. 154 at 5-6.) This is simply absurd.[2]

First, Defendant's reliance upon the misleadingly truncated statement of Teske's that "it's not the gay thing that upsets me" conveniently omits what Teske wrote *directly after* that: "It's that appearance that *because he is gay* he is spending money on his own interests -- that's a conflict." (Teske Depo at 177:1-4; Teske Depo Ex. 11) (emphasis added). Further, Teske admitted that his assumption was that because Mr. Bostock was recruiting in Midtown he was "engaging in gay-related activity, and not serious CASA-related activity." (Teske Depo. 177:22-178:4.) Thus, to the extent Teske ever "disclaimed a discriminatory motive," his own words – including those written just after that -  impeach him.

> 1. Teske's Discriminatory Animus Was the "But For" Cause of Mr. Bostock's Termination

---

[2] And Defendant's contention that  "Teske expressly states in his diary that Plaintiff was not terminated for being gay" (doc. 154 at 7) is without any evidentiary support.

Mr. Bostock has established as a matter of law that his sexual orientation was the "but for" cause of his termination. As determined by the Supreme Court, that is all that is required. *Bostock v. Clayton Cty.*, Ga, 140 S. Ct. 1731, 1739 (2020). ("Often, events have multiple but-for causes . . .[w]hen it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.")

Defendant argues, however, that "nothing in the record supports the assertion that the County would not have fired Plaintiff for his misuse of the GAL funds if he had not been gay."  (Doc. 154 at 8.) First, Defendant's conclusory assertion that Mr. Bostock "misused" GAL funds is a conclusory assumption without any evidentiary basis. Nowhere in the audit report does it say that Mr. Bostock engaged in misconduct or that he "misused" funds. (Doc. 137-3, Moore Dep. Ex. 10.) And the MOU does not limit the use of the fees only to the recruitment, training and retention of Clayton County CASA volunteers serving as court appointed advocates or guardians ad litem. (Bostock Depo. Ex. 4.)

Defendant also alleges that Mr. Bostock had previously received leniency with respect to treatment by his superiors. The events to which Defendant refers are

completely irrelevant because they had no basis in Teske's decision to terminate Mr. Bostock. Moreover, two of the three of the instances of alleged leniency towards Plaintiff took place when Judge Banke was Chief Judge, not when Teske was. (Doc. 154 at FN2.) This only underscores their irrelevance. And as to third event – the alleged "hostile work environment," Teske testified that he investigated employee complaints against Mr. Bostock and that they were not credible. (Teske Depo. 157:2-24.)  There was no "leniency" when the complaint itself was completely unfounded.

Similarly, the fact that Teske and others may have known of Plaintiff's sexual orientation for a period of time before he was terminated ignores that it was only after Mr. Bostock began participating in the Softball League and recruiting CASA volunteers and sponsors in the Midtown area that he was terminated. (Teske Depo. at 183:17–184:17; Johnson Depo. 129:22-130:1; Johnson Depo. Ex. 94.)

Additionally, it is absurd to suggest that because an employer previously knew of an individual's protected trait that the individual could never be subject to discrimination. There is no "window of tolerance" after which an employer may engage in discrimination without consequence. Nothing in Title VII supports this.

Defendant also incorrectly attempts to link Ms. Merritt's concerns following her interview with Mr. Bostock as somehow related to his expenditures. This is not so. Rather, Merritt explained that to the extent she could recall, her concerns were

based on there being more than one individual taking in money or having access to where checks or cash were kept. (Merritt Depo. 61:14-63:13; Ex. 92.) And whether Ms. Merritt harbored any anti-gay animus or not is also irrelevant because the audit itself was a product of such animus.

Defendant contests this latter statement regarding the audit, but the undisputed evidence shows the animus that infected the audit and audit process. Mr. Bostock's initial brief sets forth numerous facts evidencing this (doc. 127-1 at 17-19) including, among others, that on April 30, 2013, John Johnson wrote a memo to Stacey Merritt, Head of Internal Audits, requesting an audit of the GAL account. (John Johnson Depo., Exhibit 94). This memo from Johnson specifically questioned expenditures at "adult/alternative bars" which Johnson testified meant gay bars or alleged "gay friendly" establishments. (John Johnson Depo. at 130:6–21; Ex. 94.). This memo also specifically referenced Mr. Bostock's softball team. (Johnson Depo. Ex. 94.) Moreover, the audit file contains printouts from the websites of certain Midtown Atlanta area restaurants including a hand drawn circle around language identifying one establishment as "Atlanta['s] First and ONLY Gay Sports Bar" and highlighting of the language "Atlanta's favorite neighborhood gay bar and restaurant" for another establishment. (Docs. 137-5, 137-6, and 137-7, Moore Dep. Exs. 82, 83, 84.)

Defendant also mischaracterizes the evidence concerning Mr. Bostock's recruitment of volunteers. Under the MOU, Mr. Bostock was authorized to use these funds "to fund volunteer recruitment, training, and retention" of CASA volunteers. (Teske Depo. at 54:18–21; Teske Depo., Exhibit 3 at 2). Mr. Bostock provided Teske with detailed information concerning pledges, donations, and volunteers for training he secured from these recruiting efforts. (Bostock Dep. Ex. 10.) As Mr. Bostock explained at his deposition, an individual could volunteer for the CASA program in multiple ways beyond becoming a court appointed advocate or guardian ad litem. (Bostock Dep. 206:8-21.) And in at least one instance, an individual who was to begin the CASA application process as the result of Bostock's recruiting stopped doing so after Mr. Bostock was fired, due to his support of Mr. Bostock. (Bostock Dep. 207:6-208:14.) And of course, Defendant terminated Mr. Bostock only a short time after he began recruiting among softball league members which obviously ended the opportunities with the potential volunteers he was recruiting and the further success he may have had.

Defendant erroneously argues that many of these sponsorships were not a proper use of GAL funds and should have instead been recruited using FCCC funds. This is wrong for several reasons.

First, the MOU does not limit the use of GAL funds only to the recruitment,

training and retention of Clayton County CASA volunteers serving as guardians ad litem. (Bostock Depo. Ex. 4.)  Second, training, recruitment, and retention included aspects of the "relationship-building process," (Bostock Depo. at 120:15–121:11), and the items listed in the information Mr. Bostock provided to Teske fall within that definition. Mr. Bostock testified that  an individual could volunteer for the CASA program in multiple ways beyond just becoming a court appointed special advocate or guardian ad litem. (Bostock Dep. 206:8-21.)

Additionally, Mr. Bostock reported to the FCCC board concerning the use of these funds and on a regular basis made the bank account records available to the board with explanation for all expenditures. (Crawford Depo. at 18:4–14; Bostock Depo. at 140:6–141:1). And in late 2011 or early 2012, Mr. Bostock began providing annotated copies of bank statements from the GAL account to Mr. Johnson and Mr. Slay for their review. (Slay Depo. at 92:12–18; John Johnson Depo. at 84:21–24 to 86:14). If Defendant had questions or concerns about Mr. Bostock's spending it had every opportunity to raise them. And FCCC Chair Sabrina Crawford, who has a background in bookkeeping and accounting, reviewed the bank statements and determined that the expenditures were consistent with the MOU. (Crawford Depo. at 39:8–41:18; 41:19–24; 61:10-62:6).[3]

---

[3] Defendant's self-serving hypothetical questions about what a family would think

Moreover, the GAL funds were *not* county funds. The MOU states that "Clayton County CASA" would charge a $500 administrative fee. (Teske Depo., Ex. 3, Doc. 138-1 at 114). The checks for these monies were payable to Friends of Clayton County CASA – a private non-profit corporation - and not to the court or any other Clayton County department or entity. (Teske Depo. Ex. 3.). Plaintiff testified that the Clayton County Superior Court judges wanted the money to go to the FCCC in order to bypass county finance. (Bostock Depo. at 128:9–13). In fact, on April 30, 2013, John Johnson wrote a memo to Stacey Merritt, Head of Internal Audits, with Slay and Teske copied on the memo, stating in part that the Juvenile Court administration did not have "any direct oversight authority" with respect to the GAL account. (John Johnson Depo. at 130:6–21; Ex. 94.) And on May 1, 2013, Teske wrote an email to Johnson with Slay and Merritt copied in which Teske admitted that under the terms of the MOU, "we have no authority to gain access" to the GAL funds and directing that Johnson take the MOU "to legal and have them change the paragraph regarding where the monies go." (Merritt Dep. Ex. 59.) In other words, Defendant injected itself into an arrangement (1) over which it had no authority under the terms of the MOU; and (2) which did not involve court or county

---

about Mr. Bostock's expenditure are baseless as they are premised on the falsehood that the funds were used simply to "play softball with friends." (Doc. 154 at 13-14.)

funds; and (3) acting *ultra vires*, usurped supervision of the arrangement, overruling the non-profit that owned and oversaw management of the fund.

2. Defendant Cannot Show That it Would Have Reached the Same Decision Absent a Discriminatory Motive

Defendant wrongly contends that "there is no dispute Judge Teske would have terminated Plaintiff for expending GAL funds outside the scope of the MOU, even absent any suspicion that Plaintiff spent GAL funds on personal interests." (Doc. 154 at 15.) But this is *very much* a matter of dispute.

First, many of the grounds upon which Defendant relies on this issue have already been addressed and refuted in Section II.A.1. And as set forth at length in Mr. Bostock's initial brief, Teske deliberately mischaracterized or ignored the actual contents of the audit and instead relied upon his own discriminatory assumptions that because Mr. Bostock is gay, any expenditures in Midtown Atlanta must have been personal in nature rather than CASA related. (Doc. 127-1 at 20-22.) And any alleged conclusion Mr. Bostock spent funds outside the MOU is itself driven by his own discriminatory animus compared to (1) what the MOU actually says; and (2) what Mr. Bostock reported to him regarding his recruiting efforts and expenditures.

Thus, Defendant cannot, as a matter of law, rely on the audit to support a "same decision" defense. Mr. Bostock is entitled to summary judgment on his discrimination claim. This case should proceed to trial on the sole issue of damages.

**B. Mr. Bostock is at a Minimum Entitled to Summary Judgment Under a Mixed Motive Standard**

Mr. Bostock has established that he is entitled to summary judgment because the direct evidence shows that Teske terminated him because of his sexual orientation. Should, however, the Court determine that issues of fact remain with respect to "but for" causation or otherwise, Mr. Bostock is at the least entitled to summary judgment on a "mixed motive" theory of discrimination with the issue of but- for causation to be presented to the jury at trial.

Defendant argues, however, that "the statements on which Plaintiff relies here express no desired sexual orientation for the position of Child Welfare Services Coordinator or any other juvenile court employee." (Doc. 154 at 20.) But this argument completely ignores the fact that  Teske testified under oath that Mr. Bostock's sexuality was a "contributing factor" in Teske's decision to terminate him. That is more than enough under the motivating factor standard. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016); see also 42 U.S.C. § 2000e–2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.") Whether Teske made some general proclamation about the desired

13

characteristics of the Child Welfare Coordinator is completely beside the point given his undisputed statement as to why he terminated Mr. Bostock.

Defendant also argues that Teske's own statements in his diary are not evidence of discrimination or pretext and are simply him "acknowledging" Mr. Bostock's protected status." (Doc. 138-6 at 15.) This is simply ludicrous. Multiple references to Mr. Bostock's sexuality in the direct context of Teske's reasons for terminating him go far beyond simple "acknowledgement."[4] Indeed, his repeated to the point of obsessive references to Bostock being "gay" in the context of his decision to fire him can lead to but one conclusion: Bostock's sexual orientation was a contributing factor to the decision, which Teske freely admitted in his deposition.

Defendant even goes so far as to claim that "it [was] legitimate for Judge Teske to acknowledge Plaintiff's sexual orientation in suspecting Plaintiff may be spending GAL funds on personal interests." But Teske admitted that his alleged "suspicions" of Mr. Bostock's spending to recruit and retain volunteers for the CASA program  - the entire basis of the audit - were "because [Mr. Bostock] is gay." (*Id.*) Thus, Teske's alleged suspicions were grounded in the discriminatory belief that because Mr. Bostock is gay, he must be spending money in Midtown - which

---

[4] Teske's statements are direct evidence of discrimination. But should the Court conclude otherwise, any interpretation of his statements is an issue for the trier of fact to resolve.

Teske called "the gay district of Atlanta" - to pursue his own self interests, rather than recruiting, training or retaining volunteers.

Teske's statements and admission in his sworn testimony, at a minimum, establish the sexuality-based bias that infected his decision making process. Even if the Court should determine that issues of fact remain as to "but for" causation, Mr. Bostock is at a minimum entitled to summary judgment on a mixed motive claim with the issue of but for causation to be a matter for the tier of fact to determine.

## III.   CONCLUSION

For the reasons set forth herein and in Plaintiff's initial brief, the Court should grant Plaintiff's motion for summary judgment.

Respectfully submitted this 25th day of May 2022.

/s/ Thomas J. Mew
Edward D. Buckley
Georgia Bar No. 092750
Thomas J. Mew, IV
Georgia Bar No. 503447
Andrew M. Beal
Georgia Bar No. 043842
**BUCKLEY BEAL LLP**
600 Peachtree Street, NE, Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101
edbuckley@buckleybeal.com
tmew@buckleybeal.com
abeal@buckleybeal.com
Counsel for Plaintiff

15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **GERALD LYNN BOSTOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO: 1:16-cv-01460-ELR-WEJ** |
| **CLAYTON COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that the foregoing has been prepared in Times New

Roman 14 font, as approved by the Court in LR 5.1B.

*/s/ Thomas J. Mew*
Georgia Bar No. 503447

BUCKLEY BEAL, LLP
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Phone: (404) 781-1100
Facsimile: (404) 781-1101

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

BUCKLEY BEAL, LLP

By:    */s/ Thomas J. Mew*
       Georgia Bar No. 503447
       tmew@buckleybeal.com

BUCKLEY BEAL, LLP
600 Peachtree Street NE, Suite 3900
Atlanta, GA  30308
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101
Counsel for Plaintiff