**FILED IN CHAMBERS**
**U.S.D.C ATLANTA**

Date: Jun 07 2022

**KEVIN P. WEIMER** , Clerk

By: _s/Kari Butler_
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GERALD LYNN BOSTOCK,

     Plaintiff,

v.

CLAYTON COUNTY,

     Defendant.

CIVIL ACTION FILE NO.

1:16-CV-001460-ELR-WEJ

## FINAL  REPORT  AND  RECOMMENDATION

Plaintiff, Gerald Lynn Bostock, alleges that his former employer, Clayton County, Georgia, discriminated against him on the basis of his sexual orientation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII').  (See Third Am. Compl. [101] Count I.)  After an extended period of discovery, the parties filed cross-motions for summary judgment.  As discussed below, the undersigned **REPORTS** that there are disputed issues of material fact for trial; therefore, the undersigned **RECOMMENDS** that plaintiff's Motion for Summary Judgment [127] be **DENIED**, and that defendant's Motion for Summary Judgment [136] be **DENIED**.

## I.   STATEMENT OF FACTS

In support of his Motion for Summary Judgment, plaintiff as movant filed a Statement of Undisputed Material Facts ("PSUMF") [127-2].  See N.D. Ga. Civ. R. 56.1(B)(1).  As required by Local Civil Rule 56.1(B)(2)(a), defendant submitted a response.  (See Def.'s Resp. to Pl.'s Stat. Undisp. Mat. Facts [155] ("DR-PSUMF").)  As allowed by Local Civil Rule 56.1(B)(2)(b), defendant submitted a statement of additional material facts.  (See Def.'s Stat. of Addt'l Mat. Facts Demonstr'g that Summ. J. Should be Denied [156] ("DSAMF").)   Finally, as required by Local Civil Rule 56.1(B)(3), plaintiff filed a response to DSAMF.  (See Pl.'s Resp. & Objs. to Def.'s Stat. Addt'l Mat. Facts [165] ("PR-DSAMF").)

In support of its Motion for Summary Judgment, defendant as movant filed a Statement of Material Facts ("DSMF") [136-1].  See N.D. Ga. Civ. R. 56.1(B)(1). As required by Local Civil Rule 56.1(B)(2)(a), plaintiff submitted a response.  (See Pl.'s Resps. & Objs. to Def.'s Stat. Mat. Facts [158] ("PR-DSMF").)  As allowed by Local Civil Rule 56.1(B)(2)(b), plaintiff submitted his own statement of additional material facts.  (See Pl.'s Stat. of Addt'l Facts Present'g Gen. Issues for Trial [159] ("PSAMF").)   Finally, as required by Local Civil Rule 56.1(B)(3), defendant filed a response to PSAMF.  (See Def.'s Resp. to Pl.'s Stat. Addt'l Mat. Facts [163] ("DR-PSAMF").)

The Court uses the parties' proposed facts and their responses thereto under the following conventions.  Where one side admits a proposed fact (in whole or in part), the Court accepts it (or the part admitted) as undisputed for purposes of these Motions and cites only the proposed fact.  Where one side denies a proposed fact (in whole or in part), the Court reviews the record cited and determines whether a fact dispute exists.  If the denial is without merit, and the record citation supports the proposed fact, then the Court deems it admitted and includes it herein.  The Court sometimes modifies a proposed fact per the opposing party's response or the record cited.  Given the duplication between PSUMF and DSMF, the Court sometimes cites one and employs a "see also" signal to the other.[1]  Finally, the Court excludes immaterial proposed facts, includes some facts drawn from its own review of the record, see Fed. R. Civ. P. 56(c)(3), and considers all proposed facts in light of the standards for summary judgment, set out infra Part II.

---

[1] Because there is also extensive duplication between PSUMF and PSAMF, and between DSMF and DSAMF, the Court relies principally on PSUMF and DSMF and includes herein only new material facts proposed in PSAMF and DSAMF.  The Court also endeavored to rule on objections to proposed facts; however, given the number of objections asserted, it was not possible to do so without extending this already lengthy Report and Recommendation.  If there is no discussion of an objection asserted and the proposed fact is included herein, then a party may assume that the objection was considered but overruled.

### A.    The Juvenile Court, CASA, and Relevant Employees

The Juvenile Court of Clayton County adjudicates cases involving delinquency, abuse, and neglect of children and consists of three judges, including a Chief Judge appointed by the judges of the Superior Court of Clayton County. (DSMF ¶ 1.)  In managing its case load, the Juvenile Court utilizes court-appointed special advocates, who are trained volunteers (sometimes called "CASA volunteers" or "CASAs") supervised by Juvenile Court employees.  (DSUMF ¶ 2, lines 1-3.)[2] Clayton County CASA, short for "Court-Appointed Special Advocate," is a program within the Child Welfare Division of the Juvenile Court of Clayton County. (PSUMF ¶ 1.)  Clayton County CASA employees coordinate the assignment of CASA volunteers to be the "eyes and ears for the judge" and to be advocates for the child in cases of abuse and neglect.  (Id. ¶ 2, modified per DR-PSUMF ¶ 2.) These volunteers investigate the child's overall situation, prepare a report, and

_____

[2] The training of Clayton County CASA volunteers to serve as court-appointed special advocates is a vigorous process, including 40 hours of training (and an additional 8 hours of training to serve as CASAs in custody cases in the Superior Court) following a national curriculum, after which volunteers are sworn in by a Juvenile Court judge and certified as CASA volunteers.  (DSUMF ¶ 3.) Plaintiff testified, however, that an individual could volunteer for the CASA program in multiple ways beyond becoming a court appointed special advocate. (PR-DSUMF ¶¶ 2-3.)

advocate on behalf of the child in court (if the volunteer is available), which involves interviewing and getting to know the child, interviewing the parents, speaking with social workers, and gathering information about the child, all of which requires an average time commitment of 6 to 8 hours per week.  (PSUMF ¶ 3, modified per DR-PSUMF ¶ 3; <u>see also</u> DSUMF ¶ 2, lines 4-7.)

Steve Teske was appointed as an associate juvenile court judge with the Juvenile Court of Clayton County on July 1, 1999, as a full juvenile court judge in 2003, and as Chief Judge in 2011.  (DSUMF ¶ 4; <u>see also</u> PSUMF ¶ 4.)  Judge Teske is now retired.  (PSUMF ¶ 13.)

Plaintiff Bostock began working at the Juvenile Court of Clayton County in 2003 as the CASA Program Coordinator.  (PSUMF ¶ 7; <u>see also</u> DSUMF ¶ 6.)  At some point, there was a reorganization and creation of Child Welfare Services, which combined the Clayton County CASA Program and the Citizen Panel Review.  (PSUMF ¶ 8.)  At this time, Mr. Bostock was named the Child Welfare Services Coordinator or Chief of the Child Welfare Division.  (<u>Id.</u> ¶ 9; <u>see also</u> DSUMF ¶ 6.)  In his role as Chief of the Child Welfare Division, Mr. Bostock was charged with recruitment, training, and retention of CASA volunteers as well as marshalling and funding recruitment, training, and retention.  (PSUMF ¶ 10.)  He also was

responsible for overseeing the programs of the Juvenile Court that worked with victims of child abuse and neglect.  (DSMF ¶ 6.)

In 2009, Colin Slay became Chief of Staff at the Juvenile Court and plaintiff's immediate supervisor.  (DSMF ¶ 7; see also PSUMF ¶ 11.)  Mr. Bostock also reported to John Johnson, who has served as the Juvenile Court Administrator since 2003.  (DSMF ¶ 7; see also PSUMF ¶ 12.)  At the time of plaintiff's termination in 2013, Mr. Slay reported to Mr. Johnson, who in turn reported to Judge Teske.  (PSUMF ¶ 13, modified by DR-PSUMF ¶ 13.)[3]

Mr. Bostock is gay, and his sexual orientation was well known to his managers.  (PSUMF ¶¶ 5-6.)  Judge Teske, Mr. Johnson, and Mr. Slay were aware that plaintiff was gay within a short period of time after he began working with the Juvenile Court.  (DSUMF ¶ 11.)  Over the years, plaintiff had introduced his partners (including Keith Sweat, who was plaintiff's partner for 12 years, and Paul Holland) to co-workers at the Juvenile Court (including Judge Teske, Mr. Johnson, and Mr. Slay) at work and at functions sponsored by the Friends of Clayton County

---

[3] Following a restructuring in 2015, Mr. Slay began reporting to Judge Teske. (DR-PSUMF ¶ 13.)

CASA, Inc.  (Id. ¶ 12.)[4]  Judge Teske, his wife, plaintiff, and his partner (Mr.

Sweat) socialized together on many occasions, including attending musicals, going

out for dinners, having barbecues and dinners at each other's homes, and other

social gatherings; plaintiff and his new partner (Mr. Holland) also attended the

wedding of Judge Teske's daughter.  (Id. ¶ 14.)  Plaintiff admits that neither Judge

Teske, Mr. Johnson (other than one alleged comment by Mr. Johnson in 2003 about

plaintiff not caring if female employees were interested in him), Mr. Slay, nor any

other juvenile court employee made any negative comments to him about being

gay.  (Id. ¶ 15.)[5]

---

[4] The Court excludes DSMF ¶¶ 5 and 13 as immaterial.  The Court likewise excludes DSMF ¶¶ 25 through 27 and DSAMF ¶¶ 28 through 29, which address claimed issues with plaintiff's job performance in past years, as immaterial. Although plaintiff's supervisors (including Judge Teske) may have shown leniency to him by not disciplining or terminating him for the issues identified in those proposed facts, nothing in the record connects those issues with plaintiff's discharge in 2013.  All of these proposed facts may be relevant to a jury but not to the undersigned in reviewing a motion for summary judgment.

[5] Mr. Bostock claims that Mr. Johnson said at his termination, "This is not because you are gay."  (PR-DSMF ¶ 15.)  This comment (discussed infra) does not contravene the statement preceding this note.  Plaintiff also claims that he heard from someone that the Chairman of the Clayton County Board of Commissioners commented that he was uncomfortable being around plaintiff because of his sexuality.  (Id.)  There is no evidence that the Commission Chairman had anything to do with plaintiff's discharge, so this hearsay assertion is immaterial.  Thus, DSMF ¶ 15 stands undisputed.

Finally, Judge Teske has co-authored articles on behalf of a national juvenile justice non-profit advocating in support of LGBTQ youth, because the largest group of homeless children are LGBTQ youth.  Judge Teske also agreed with plaintiff that Title VII should prohibit employment discrimination on the basis of sexual orientation.  (DSMF ¶ 5.)

**B.    Friends of Clayton County CASA, Inc.**

The Friends of Clayton County CASA, Inc. ("FCCC") is a 501(c)(3) non-profit entity formed to provide support to the Clayton County CASA program and its director, increase public awareness of the program, help recruit volunteers, and raise funds.  (DSMF ¶ 8; see also PSUMF ¶¶ 14-15.)  In addition to his duties at the Juvenile Court, plaintiff had a role at FCCC.  (PSUMF ¶ 14, modified by DR-PSUMF ¶ 14.)  The FCCC helped to recruit volunteers for the CASA program and to secure funds to retain them.  (PSUMF ¶ 16.)  Sabrina Crawford served on the FCCC Board from 2005 until 2013 and was its Chair for a majority of that time.  (PSUMF ¶ 17, modified per DR-PSUMF ¶ 17.)

There are CASA-related activities undertaken by the FCCC that are not associated with the Juvenile Court.  (DR-PSUMF ¶ 16.)  For example, the Darlin' Duck Derby was the primary fundraiser for the FCCC, which typically was held on the last Saturday of September, and would entail rubber ducks on a race course

with numbers on them purchased by FCCC donors or sponsors.  All money generated by the Duck Derby, as well as from other donations and sponsorships, were placed into an FCCC bank account.  Because the FCCC was a non-profit, the County had no oversight over the use of its funds.  (DSMF ¶ 9, modified per PR-DSMF ¶ 9.)

> Article VII, Section 2 of the FCCC's By-Laws state as follows:

>> Checks, drafts and other demands for money shall be signed by the Chairperson, or Treasurer.  Additionally, other officers, from time to time, may be designated by the Board of Directors.  The Chairperson and the Treasurer can sign checks for under $500.  Two signatures are required for checks in excess of $500.

(Bostock Dep. Ex. 2 [132-3], at 6 (CLAYTON_000376), cited in DSMF ¶ 10.) Despite this quoted language, plaintiff claims that the FCCC Board gave him "spending authority" over certain money within its oversight.  (PR-DSMF ¶ 10.)

**C.   The Memorandum of Understanding**

Before 2007, in custody disputes pending in the Superior Court, its judges would appoint a guardian ad litem ("GAL") to represent the child(ren) at the expense of the parents; the GAL would typically be an attorney.  (DSMF ¶ 16.) Because the Superior Court judges were having difficulty getting GALs appointed when needed because the parties often could not afford the expense of an attorney, Superior Court Judge Deborah Benefield approached Judge Teske with the idea of

the Superior Court utilizing a Juvenile Court employee to serve as a GAL in custody cases and to supervise volunteer GALs in custody cases, in exchange for charging the parties a $500 administrative fee, which would be a more cost-effective and affordable way for appointing a GAL to advocate on behalf of children in Superior Court custody dispute cases.  (Id. ¶ 17.)

To formalize the agreement, the Chief Judge of the Superior Court at the time (Matthew O. Simmons), the Chief Judge of the Juvenile Court at the time (K. Van Banke) and plaintiff, as Clayton County CASA Program Coordinator, signed a Memorandum of Understanding ("MOU") in 2007, which provided that Clayton County CASA would charge a $500 administrative fee (to be paid equally by both parties) in child custody cases, and that these fees would be made payable to the FCCC, in care of plaintiff.  (DSMF ¶ 18, modified per PR-DSMF ¶ 18; see also PSUMF ¶¶ 18-20.)  Mr. Bostock asserts that the Superior Court judges wanted the money to go to the FCCC in order to bypass Clayton County finance.  (PSAMF ¶ 13.)

10

The MOU states that the FCCC is the recipient of the administrative fee and will use the fees to fund "volunteer recruitment, training, and retention." (MOU, Section II [141-2] 2.)[6] The parties differ on the meaning of the quoted language.

The County contends that the administrative fees were to be used only for the recruitment, training and retention of Clayton County CASA volunteers serving as GALs and not for FCCC fundraising or marketing purposes or for the recruitment, training and retention of other types of CASA volunteers. (DSMF ¶ 19.) In contrast, plaintiff asserts that the MOU authorized him to use these fees to fund "volunteer recruitment, training, and retention" of all types of CASA volunteers. (PSUMF ¶ 21.) Plaintiff contends that the money obtained from the administrative fee could be used to recruit CASA volunteers, in-kind services,

_____

[6] Mr. Slay agreed that the above-quoted directive on how fees could be spent is not specific. (PSUMF ¶ 22.) However, it is difficult to come to any conclusion but that the MOU intended the fees collected from families in custody disputes to fund "volunteer recruitment, training, and retention" of persons to serve as "CASA/GALs." The MOU uses the quoted acronym 57 times over 6 pages in describing the roles and responsibilities of CASA/GALs, their appointment and assignment, how they gather information, how they report information, their resignation or termination, and their supervision. Indeed, the MOU states that the goal of providing CASA/GAL services to children involved in custody disputes required the development of a working relationship between the Clayton County Superior Court and the Clayton County CASA program and execution of the MOU. (MOU, Goal para. [141-2] 1.)

11

sponsorships, donors, and other aspects of recruitment as a relationship-building process, and that individuals could volunteer for the CASA program in multiple ways beyond just becoming court-appointed advocates or GALs.  (PR-DSMF ¶ 19; see also PSAMF ¶ 17.)

The FCCC had two bank accounts:  its own account and the GAL account. (PSUMF ¶ 23.)   The FCCC Board decided that the $500 administrative fee collected under the MOU would go into the GAL account.  (Id. ¶ 24; see also DSMF ¶ 20.)[7]  The MOU had no impact on money the FCCC collected from its fundraising efforts and placed in its own bank account.  (DSMF ¶ 20.)

### D.      Plaintiff's Expenditure of Funds from the GAL Account

Plaintiff testified that the MOU authorized the expenditure of GAL funds on FCCC fundraising activities.  (DSMF ¶ 21.)  Plaintiff further testified that money from the GAL account and money from the FCCC account could be spent for the same purposes if related to recruitment, training and retention.  (Id. ¶ 22, modified

_____

[7] Given that the administrative fee was collected from litigants and then given to the FCCC, the money did not come from the County's taxpayers and did not belong to the Clayton County Courts.  (PSAMF ¶ 14, modified per record cited.)  The MOU controlled how FCCC spent the money, and the Juvenile Court put one of its employees—Mr. Bostock—in charge of that spending.  The Court excludes PSUMF ¶ 25 as unsupported by the record cited.  (See DR-PSUMF ¶ 25.)

per record cited.)  Plaintiff's expenditures from the GAL account did not need approval from the FCCC Board.  Plaintiff testified that the FCCC Board Treasurer initially approved reimbursements for his expenditures from the GAL account, but eventually gave him spending authority over the GAL account (but not over the FCCC's main account); the Board even provided plaintiff with a debit card for the GAL account.  (Id. ¶ 23, modified per PR-DSMF ¶ 23.)  FCCC Board members had the opportunity to review the GAL bank statements at each meeting.  (PSUMF ¶ 26, modified per record cited.)  According to long-time FCCC Board member (and sometimes Chair) Crawford, Mr. Bostock would discuss how GAL funds "were being spent during our board meetings."  (Crawford Dep. [133] 37.)  Mr. Bostock characterizes this as "oversight" from the FCCC board (PSAMF ¶ 23), but in reality, the Board allowed Mr. Bostock to spend the GAL funds as he saw fit because it did not consider the funds as belonging to the FCCC.  (DR-PSAMF ¶ 23.)

In late-2011 or early-2012, Mr. Bostock began providing copies of bank statements from the GAL account to Mr. Johnson and Mr. Slay for their review. (PSUMF ¶ 27.)  Sometimes entries on the statements were annotated and sometimes they were not, and in some months, Mr. Bostock did not provide statements.  (DR-PSUMF ¶ 27.)  Mr. Slay reviewed the statements and generally

13

found Mr. Bostock's explanations for his expenditures to be satisfactory, in that nothing "flew off the page as inappropriate." (PSUMF ¶ 28; <u>see also</u> Slay Dep. [140] 98-99, cited in DR-PSUMF ¶ 28 .) Mr. Johnson also reviewed the bank statements submitted by Mr. Bostock. (PSUMF ¶ 29.) Mr. Johnson testified that he had concerns about some of the expenses reflected in the statements. (DR-PSUMF ¶ 29; <u>see also</u> DSMF ¶ 28.)[8]

### E.    Plaintiff's Softball League

In January 2013, Mr. Bostock began participating in the Hotlanta Softball League ("HSL"), a gay men's sports league. (PSUMF ¶ 30, modified per record cited.) Mr. Bostock recruited members of the league to volunteer for CASA or to sponsor events. (<u>Id.</u> ¶ 31.) Mr. Bostock also secured FCCC sponsorships from certain league members. (<u>Id.</u> ¶ 32.)

### F.    Events Leading to an Audit of the GAL Account

Leading up to 2013, the County's Internal Audit Department made a concerted effort to identify County departments or employees who handled cash or

---

[8] Mr. Johnson asserts that when he questioned plaintiff about some of the expenditures reflected in the bank statements, on a few occasions Mr. Bostock told him it was "none of his business." (DSMF ¶ 29.) However, Mr. Bostock denies that he ever said that to Mr. Johnson. (PR-DSMF ¶ 29.) Mr. Johnson never disciplined Mr. Bostock if he made such a statement. (<u>Id.</u>)

were responsible for bank accounts about which it was unaware, as these were viewed as liability risks. (DSMF ¶ 31, modified per record cited.) Accordingly, when the Director of the County's Internal Audit Department, Stacey Merritt, spoke to Mr. Johnson about the upcoming scheduled audit of the Juvenile Court, she asked him if there were any bank accounts being maintained by juvenile court employees other than the bank account maintained by the clerk of the Juvenile Court. Mr. Johnson informed her of a petty cash account he maintained as well as the GAL account maintained by plaintiff. (DSMF ¶ 32.) When Mr. Johnson told Ms. Merritt that he had concerns about the GAL account, including the fact that its money was being kept in drawers, Ms. Merritt elected to speak with Mr. Bostock. (Id. ¶ 33.)

Ms. Merritt met with plaintiff for 10 to 15 minutes. (DSMF ¶ 33.)[9] Ms. Merritt asked plaintiff standard questions, such as where money is stored, how is it stored, how long it is stored, and who has access to it. (Id. ¶ 34, first sentence.) Given Mr. Bostock's responses to her questions, including his revelation that multiple people received funds and had access to cash, she believed that an audit

_____

[9] The record is unclear about when they met. However, on April 23, 2013, Ms. Merritt sent an email to Mr. Johnson about her conversation with plaintiff (quoted infra). Thus, their conversation was on or before this date.

15

should be conducted.  (Id. ¶ 34, second sentence, modified per record cited.)

Therefore, on April 23, 2013, Ms. Merritt sent the an email to Mr. Johnson, which

reads in relevant part as follows:

> As part of our now annual cash audit I spoke with Gerald Bostock regarding the cash for CASA account (program).  While this does not fall under the scope of the current cash audit of monies issued by the Finance Department, I am concerned by the lack of policies and procedures regarding this fund.  Just from talking with him I see several possible grey areas and believe that there is definitely risk of inappropriate actions unless additional policies and procedures are put in place.  I definitely believe this fund needs to be looked at more carefully in order to reduce future risk and assess current status.
>
> If you would like our assistance please send the [County Commission] Chairman an email regarding the situation.  The Chairman can then officially assign this audit to my department and we can set up a date to begin.  I believe we could make time to start in a few  weeks.

(Pl.'s Ex. 92 [142-8] 236; see also DSMF ¶ 34, second-third sentences & DSAMF

¶ 36; PSUMF ¶ 36.)

It was necessary to obtain authorization from the Chairman of the Board of

Commissioners, Jeff Turner, and from Judge Teske to conduct a full audit of the

GAL account in the near future; otherwise, the full audit would have been

16

scheduled for later after other audits already scheduled had been completed. (DSMF ¶ 35.)[10]

On April 30, Mr. Johnson sent Ms. Merritt the following email with the reference, "CASA Audit":

> Attached is the MOU between the Superior Court of the State of Georgia for the county of Clayton and Clayton County CASA. Please look at Section II. Administrative Fee as this pretty much sums it up and what is expected. The Chief of Staff, Colin Slay and myself have concerns with the lack of oversight with regard to this fund collected via the MOU between the above mentioned organizations. These funds are designated to support volunteer recruitment, training and retention for the Juvenile Court's CASA Program, and they are collected by several Juvenile Court employees who many times receive cash at an amount of $500.00 per case. Further the Juvenile Court's Child Welfare Coordinator apparently has access to spend these funds at this discretion all without any direct oversight authority by the Juvenile Courts Administration. As such we have no proper accounting of the collection and expenditure of these funds, and that concerns us. The employees of this coordinator have provided direction as where to find what they feel as inappropriate expenditure of these funds. Many of these funds have been spent on alcohol and most of these meetings have been held at night at bars and restaurants. We have a $15 million building and I ask the question why many of these meetings were held at night at bars and restaurants. I would like to see a complete audit/reconciliation of the GAL funds collected and

---

[10] On the way to a golf tournament with Carol Gossett and Griffin Shirley on April 29, 2013, Ms. Gossett inquired about what was going on with plaintiff; Judge Teske replied that it would be difficult for him to keep his job after the upcoming audit. (DSMF ¶ 37.) Plaintiff disputes that, asserting that Ms. Gossett told him that Judge Teske had said "he was going to get rid of" him. (PR-DSMF ¶ 37.)

would like to revisit how these funds are utilized to ensure Friends of Clayton County CASA is meeting the stated objective of the MOU.

Specifically, we[11] have the following concerns:

1)   How much money has been brought in under this MOU, and what has been spent?

2)   How (on what) are the funds being spent?  I have attached several receipts and bank statements with Mr. Bostock's signature which appear[] inappropriate and personal in use. There are several receipts from liquor stores and (adult/alternative bars) that do not meet the proper use of these funds.  There are several checks written out to the Honey Badgers softball team and a reception AT A Birmingham, Alabama hotel which are directly tied to a softball team which Mr. Bostock is a member of.  To, me, this appears to be a conflict of interest at best.[12]

3)   There appears to be at least (2) debit/credit cards that Mr. Bostock has at his leisure with no accounting to as far as the Juvenile Court is concerned.

4)   What, if any, is the structure for the expenditure of these funds (does the Friends' Board vote on them)[?]  Is there a policy in place?  Who had discretionary spending authority?

5)   On at least two (2) occasions, Mr. Bostock has told me and Mr. Slay that we have no authority to look into the books, and spending of this account which is surely a "red flag" which

---

[11] Mr. Johnson testified the "we" referenced above included himself, Mr. Slay, and Judge Teske.  (PSUMF ¶ 37, modified per record cited.)

[12] Mr. Johnson testified that "adult/alternative" bars meant gay bars or gay-friendly bars.  (PSUMF ¶ 35.)  As noted above, Mr. Johnson mentions plaintiff's softball team.  (Id. ¶ 36.)

> warrants investigation.  Mr. Bostock even made this statement
> to Mr. Slay and myself within hours after you talked to him.

(Pl.'s Ex. 94 [142-8] 238; see also DSMF ¶ 38, first sentence; PSUMF ¶ 34.)

On May 1, 2013, Judge Teske wrote a memo to Commission Chairman Turner requesting a formal audit of the GAL account.  (PSUMF ¶ 38.)[13]  Chairman Turner authorized the audit based on Ms. Merritt's recommendation, an email from Shawn Black alleging that plaintiff was not spending the GAL funds appropriately,[14] Carol Gossett's previous statement to Judge Teske during a swearing-in ceremony for CASA volunteers that there were not sufficient funds in

---

[13] Because PSUMF ¶ 39 inaccurately states the reason for the audit, the Court excludes it as unsupported by the record cited.

[14] On January 17, 2013, Shawn Black, a Juvenile Court employee whose employment had just ended, sent an email to Mr. Johnson (who then gave it to Judge Teske and Mr. Slay) asserting that plaintiff had engaged in misconduct, including that (1) "Duck Derby and GAL funds are spent to buy alcohol, lunches for staff that he chooses to hangs with"; and (2) GAL funds "have been used to move Gerald's furniture during the courthouse move, paying for him to treat people to lunch, removing a boot from his car because he parked illegally, many other things that should not be included in charity money expenditures."  (DSMF ¶ 30.) Plaintiff correctly notes that the subsequent audit did not address the items mentioned in Mr. Black's email.  (PR-DSMF ¶ 30.)  However, the Court includes the email in the chronology because it was one of the pieces of information which led the County to audit the GAL account.  The Court further overrules plaintiff's hearsay objection, as the information therein is either not hearsay (because it is not offered for the truth of the matter) or if hearsay, could be reduced to admissible evidence by calling Mr. Black to testify at trial.

19

the GAL account to pay for the usual amenities for these new CASA volunteers, and Mr. Slay's recommendation that it would be preferable for a professional accountant to review the bank statements for the GAL account that he had been reviewing.  (DSMF ¶ 36.)

Also on May 1, 2013, Judge Teske sent an email to Mr. Johnson (with copies to Mr. Slay and Ms. Merritt), stating as follows:

> After further consideration of auditing CASA fiscal books, I am concerned to learn that the GAL monies from the Superior Court cases are given to Friend[s] of CASA—a nonprofit entity separate from the County and Juvenile Court for which we have no authority to gain access.  Thank you for obtaining the MOU signed by the prior Chief Judge that authorizes the monies to go to Friends of CASA.  As the current chief judge, I have concerns about this arrangement because this is a county employee for which we have agreed to loan to the Superior Court that consequently removes direct services to our children under our jurisdiction.  I agree that the consideration for us is to reduce the number of cases transferred to us from the Superior Court.  I have no problem with the CASA/Superior Court program, but I do have a problem with the monies received from that program going to a third party with no oversight.  These monies are generated by a county employee during county work hours for which the juvenile court should have control with county finance oversight.
>
> Therefore, I am directing you to take the MOU to legal and have them change the paragraph regarding where the monies go reflect instead to the Clerk of the Juvenile Court to be designated as a line item titled GAL Superior Court Program and to be dispersed to support the [CASA program] (using the current language of the MOU) in accordance with the policies and procedures of the county for disbursement of said funds.  [P]lease have the attorney place my name

and Judge Deborah Benefield as the signatories.  I will present it to Judge Benefield.

Also, until this MOU is executed, I am unilaterally directing you to inform Mr. Bostock that all GAL funds from parties in superior court shall be made out to The Clerk of the Juvenile Court of Clayton County.  You are to direct Robin to create on the books as we do for supervision fees a line item titled GAL Superior Court Fees.  Mr. Bostock may request use of those fees in support of the CASA program using the same process used to request supervision fee funds.

This process shall remain in full force and effect until I receive recommendations from the internal audit.

I do want to know how Mr. Bostock responds to this directive.  If it becomes necessary, please inform him that the CASA program is a county program, not private, and that the Chief Judge is responsible for the operations of all court programs, including CASA.

(Pl.'s Dep. Ex. 59 [141-17] 1; see also PSAMF ¶ 33.)

## G.    Conduct of the Audit

Before associate internal auditor Leslie Moore began her work, Mr. Johnson met with her and stated that he wanted to find out about the use of the funds in the CASA GAL account because he had concerns that they might have been spent improperly.  (PSUMF ¶ 40, modified per record cited; see also DSMF ¶ 38, second sentence.)  Mr. Johnson also told Ms. Moore that plaintiff was gay, although she

did not consider that fact relevant to the audit.  (PSUMF ¶ 40, modified per record cited.)[15]

Ms. Moore interviewed Mr. Bostock and found him to be cooperative and forthcoming.  (PSUMF ¶ 43.)  She also interviewed Ms. Gossett and Deborah Stinson, who was a member of the FCCC Board, and asked plaintiff follow-up questions.  (DSMF ¶ 39, modified per PR-DSMF ¶ 39.)  Ms. Moore also reviewed bank statements for the GAL account provided by plaintiff and made notations on some of them.  (DSMF ¶ 40.)  She observed that about six months of bank statements were missing, as well as some receipts that supported reimbursements.  (Id. ¶ 41, modified per record cited.)  However, Ms. Moore had no specific recollection of asking Mr. Bostock if he could locate the missing records.  (Moore

_____

[15] Mr. Johnson did not tell Ms. Moore in their conversation that he had been reviewing GAL account bank statements provided by Mr. Bostock over the past couple years.  (PSUMF ¶ 41.)  Ms. Moore testified that it would have been important to know that information.  (Id. ¶ 42.)  This is because Mr. Johnson was requesting an audit and asserting a lack of oversight and ignorance on where the funds were being spent.  But, if Mr. Johnson had been keeping tabs on the bank statements, then his audit request would have made no sense.  (Id., modified per record cited.)  However, as the County correctly points out, Ms. Moore should have assumed Mr. Johnson had some familiarity with the bank statements given that he mentioned them in his April 30 memo and attached some excerpts thereto.  (DR-PSUMF ¶¶ 41-42.)  Moreover, Ms. Moore avers that, even had she known that Mr. Johnson was reviewing the bank statements, it would not have changed the findings of the audit.  (Moore Decl. [136-5] ¶ 5.)

Dep. [142-7] 19.)  Although FCCC was the owner of the GAL account, Ms. Moore did not ask anyone at FCCC for copies of the missing records.  (PSUMF ¶ 44.)

When Ms. Moore noticed establishments listed on the bank statements where plaintiff had spent GAL funds that she did not recognize, she looked them up on the internet to find out more about them and where they were located; on a few occasions, she printed out pages from websites maintained by those establishments and made notes on them, circled some entries, or highlighted some entries.  She also looked up plaintiff's softball league—HSL—which had an Atlanta address on the internet to find out more about it.  (DSMF ¶ 42.)[16]  Ms. Merritt also reviewed the bank statements and other information that Ms. Moore had gathered, discussed the audit with Ms. Moore as it was ongoing, and reviewed and made minor revisions to the audit report that Ms. Moore prepared.  (Id. ¶ 43.)

_____

[16] The audit file contains a copy of a webpage from Blake's on the Park in Atlanta (Pl.'s Ex. 82 [142-7] 53); a copy of a webpage for the HSL with a notation reflecting the address of its playing field in Atlanta (id. at 54-56); a copy of a webpage for Cowtippers Atlanta (Pl.'s Ex. 83 [142-7] 57); a copy of a webpage for Woofs Atlanta, with a circle drawn around the words, "Atlanta First and ONLY Gay Sports Bar" (id. at 58-59); a copy of a webpage for Canoe Atlanta (id. at 60); and a copy of a webpage for Joe's with a highlight over its request to "Join us at Joe's on Juniper, Atlanta's favorite neighborhood gay bar and restaurant."  (Pl.'s Ex. 84 [142-7] 61; see also PR-DSMF ¶ 42; PSAMF ¶ 40.)

H.    **Audit Findings**

The audit found that the Child Welfare Services Coordinator (Mr. Bostock) was the primary custodian of the GAL account, processed payments and reimbursements, wrote checks, and made deposits; that the moneys collected were kept in a locked drawer inside of a locked office until deposited; and that plaintiff's activities with the GAL funds were "a direct violation of separation of duties." (DSMF ¶ 44, citing audit report, copy filed as Pl.'s Ex. 10 [142-8] 209-16.)[17]  The audit recommended that all GAL administrative fees be deposited with the Clerk of the Juvenile Court, and this change was made while the audit was ongoing.  (Id. ¶ 45.)[18]  The audit further noted that, according to FCC board member Stinson, "most fund expenses and anticipated expenses should be discussed at board meetings."  (Audit Report, Pl.'s Ex. 10 [142-8] 212.)  However, the auditors' review of the GAL bank statements led them to "believe that there is very little

_____

[17] Ms. Moore testified that "separation of duties" means that "you have one person receiving funds … [and] another person who may do reconciliation of the funds.  And you may have another person that actually deposits the funds." (Moore Dep. [137] 71-72.)  Ms. Moore agreed that having one person perform all of these tasks was not illegal but was not the best accounting practice.  (Id. at 73.)

[18] Available bank statements showed that between February 2011 and April 2013, $14,853.28 in administrative fees were deposited into the GAL account. (DSAMF ¶ 47.)

oversight concerning the day-to-day and weekly expenditures from the account." (Id.; see also DSMF ¶ 46, quoting Audit Report.)  The audit stated that plaintiff, who had discretionary spending authority over the GAL account, had two debit/credit cards imprinted with his name—one for the FCCC account and one for the GAL account.  (Audit Report, Pl.'s Ex. 10 [142-8] 212.)  The audit covered the period from February 2011 through April 2013.  (Id. at 213.)  Bank statements were not available for January 2011, May-June 2012, and September-October 2012. (Id.)  The audit noted that "[m]issing bank statements give way to speculation of impropriety.  Lack of an audit trail should be considered a red flag to management." (Id.; see also DSMF ¶ 47.)[19]

The audit recommended that the GAL account be reconciled on a monthly basis to "prevent any misuse of funds" and that "[s]trict guidelines regarding meals and entertainment should be initiated and enforced by all managing parties; especially disbursements concerning alcohol."  (DSMF ¶ 51.)  The audit also found that plaintiff used GAL funds to sponsor a softball team (of which he was a

---

[19] As noted above, Ms. Merritt did not recall asking Mr. Bostock for the missing bank statements and she did not ask FCCC for them.  Moreover, Ms. Moore testified that the audit did not conclude that plaintiff had stolen any money. (Moore Dep. [137] 82, 85.)

member) that is a part of the HSL out of the City of Atlanta, and that the expenses incurred with this sponsorship included a reception held in Birmingham, Alabama. (Id. ¶ 52.)[20]  The audit concluded that (1) "sports league sponsorships do not fall within the current intentions of the GAL account"; (2) if the Chief Judge decides that such expenditures are acceptable, the MOU should be amended accordingly; (3) any CASA-sponsored sports leagues should be based in Clayton County; and (4) any standard operating procedures developed should require written requests and authorization for all sponsorships.  (Id. ¶ 53.)

The audit found that, from February 2011 to April 2013, a total of $5,510.42 in GAL funds (not including the expenditures contained in the six months of missing bank statements) was spent on "Miscellaneous" expenses, which included purchases at retail store such as Lowes and Home Depot.  (DSMF ¶ 48.)  The audit also found that, from February 2011 to April 2013, a total of $3,495.48 in GAL

---

[20] Judge Teske testified that Mr. Bostock should have consulted with him before spending money on softball uniforms.  (Teske Dep. [141] 195, cited in PSUMF ¶ 55.)  Judge Teske agreed, however, that Mr. Bostock had consulted with the FCCC board about it and to his knowledge, they "approved" it.  (Id.)  That approval is in quotation marks because, as noted elsewhere herein, although the FCCC Board may have been the owner the GAL account, it did not approve expenditures; instead, the Board relied on Mr. Bostock to spend those funds in compliance with the MOU.

funds (not including the expenditures contained in the six months of missing bank statements) was spent on "Recruitment, Training, Retention;" that all or almost all of the "Recruitment, Training, Retention" expenses incurred in 2011 (100%) and 2012 (98%) were for meals and entertainment; and that 57% of the "Recruitment, Training, Retention" expenses incurred during the first four months of 2013 were for meals and entertainment.  (Id. ¶ 49.)  Finally, the audit found that many of the meals and entertainment expenses for "Recruitment, Training, Retention" consisted of "lunch and dinner meetings at restaurants and bars;" that many of these restaurants and bars "were located outside the Clayton County area;" that "details of the disbursements were missing from many of the actual transactions;" and that "there was evidence of GAL funds being expensed on alcoholic beverages at restaurants, bars, and package stores."  (Id. ¶ 50.)[21]  Plaintiff does not dispute that

---

[21] The parties dispute whether GAL funds could be used to purchase alcohol. Plaintiff contends that nothing in the MOU prohibits it. (PSAMF ¶ 18.) Moreover, Mr. Bostock claims that no one ever told him that use of GAL funds to purchase alcohol was an issue, including Mr. Johnson, who reviewed receipts submitted to him that reflected in part the purchase of alcoholic beverages as part of recruitment, training, and retention expenditures. (Id. ¶ 19.) In contrast, the County asserts that its policies prohibit the use of County funds to purchase alcohol, and that FCCC policies prohibit the use of its funds to purchase alcohol. (DSMF ¶ 71.) Judge Teske, Mr. Johnson, Mr. Slay, and the auditors concluded that, because the funds deposited into the GAL account pursuant to the MOU were generated from fees

the information stated above is found in the audit, but notes that the categorization of expenses was the auditors' interpretation, and that while documents may have been missing, the auditors made little effort to locate them.  (PR-DSMF ¶¶ 48-50.)

## I.      **Post-Audit Meeting**

Ms. Merritt and Ms. Moore met with Mr. Johnson and Ms. Slay for about an hour on May 23, 2013, summarized for them the findings and recommendations of the audit, gave them a copy of the Audit Report, and also gave a hard copy of the Audit Report to Judges Teske and Benefield.  (DSMF ¶ 55.)  It is not the typical practice of the Internal Audit Department to recommend personnel action by County departments and, consistent with that practice, Ms. Merritt and Ms. Moore did not make any recommendations as to what, if any, disciplinary action should be taken against plaintiff as a result their findings and left this decision up to the Juvenile Court administration.  (Id. ¶ 56.)  Thus, the Audit Report neither stated that Mr. Bostock had engaged in any wrongdoing nor suggested that he should be

---

charged by the Superior Court, the County's prohibition on the use of its funds to purchase alcohol applied, and that plaintiff's use of the GAL funds to buy alcohol was impermissible.  (Id. ¶ 72.)  The Court excludes PSAMF ¶ 41 as immaterial.

disciplined.  (PSUMF ¶ 59.)[22]  However, it was the auditors' conclusion that Mr. Bostock had spent funds from the GAL account on activities or events that were not authorized by the MOU, and that the changes they recommended were intended to prevent that from occurring in the future.  (DSMF ¶ 54, modified per record cited.)

### J.   Judge Teske's Response to the Audit

Soon after receiving the Audit Report, Judge Teske, Mr. Slay and Mr. Johnson met with Renee Bright (the County's Human Resources Director), Ms. Moore, and Ms. Merritt to discuss it.  Judge Teske and Ms. Bright agreed that Judge Teske would prepare written questions for plaintiff to answer so that he would have an opportunity to respond to the audit's findings before any personnel decision was made.  (DSMF ¶ 57.)

On May 28, 2013, plaintiff received a memorandum from Mr. Johnson (dated May 24) instructing him to respond by May 31, 2013 to ten questions

_____

[22] Ms. Moore did not consider it an inappropriate use of GAL funds to take people to lunch to try and recruit them.  (PSUMF ¶ 56.)  Ms. Moore also testified that Mr. Bostock's recruiting efforts within the gay community did not mean that he was spending money on his own interests.  (Id. ¶ 50.)  Mr. Johnson testified that there was no restriction in the MOU with respect to Mr. Bostock recruiting or training in Midtown Atlanta.  (Id. ¶ 57.)  Finally, Mr. Slay testified that engaging in a recruiting event at a gay bar would not be an improper use of funds.  (Id. ¶ 58.)

prepared by Judge Teske relating to the audit's findings, including (1) plaintiff's purchases at retail stores; (2) the six months of missing bank statements identified in the audit; (3) the many charges at restaurants and bars outside Clayton County; and (4) plaintiff's sponsorship of his softball team, including a reception in Birmingham.  (DSMF ¶ 58; <u>see also</u> Pl.'s Ex. 80 [141-23], copy of memorandum.)

On May 31, 2013, plaintiff submitted to Mr. Johnson his written responses (erroneously dated May 28, 2012) to Judge Teske's written questions regarding the findings of the audit, which Mr. Johnson and Mr. Slay brought to Judge Teske. (DSMF ¶ 59; <u>see also</u> Pl.'s Ex. 81 [141-24], copy of memorandum,)  In response to Judge Teske's written questions instructing plaintiff to explain the numerous restaurant and bar expenses outside of Clayton County, Mr. Bostock identified numerous restaurant and bar expenses.  (DSMF ¶ 60.) [23]  Some of those establishments listed were in Midtown Atlanta and catered primarily to a gay

_____

[23] Defendant contends that "most" of those expenses listed by plaintiff in his memorandum did not relate to the training, recruitment or retention of Clayton County CASA GAL volunteers, but rather related to marketing, awareness, and fundraising endeavors and events for FCCC or other entities.  (DSMF ¶ 60.) However, the record defendant cites to supports this contention (Pl.'s Ex. 81 [141-24] and excerpts from Mr. Boston's deposition) fails to do so.

clientele, including F.R.O.G.S., Cowtippers, Woofs, Blakes, and Joe's on Juniper. (Id. ¶ 61.)[24]

In response to Judge Teske's written questions as to why it was appropriate for GAL funds to be used to sponsor plaintiff's softball team, including the Birmingham reception, Mr. Bostock responded as follows:

> The sponsorship of a HSL softball team in Atlanta was discussed with Friends of Clayton County CASA Inc board members Guy Alexander and Sabrina Crawford prior to committing the funds.  The intent behind this sponsorship was clearly to promote the Clayton County CASA program, recruit potential volunteers, educate the Atlanta area about child abuse and neglect issues, and to secure potential Darlin' Duck Derby sponsors and derby ticket sales.  HSL is an active city member of the Amateur Sports Alliance of North America (ASANA) and the North American Gay Amateur Athletic Alliance (NAGAAA), and happens to be the second largest league in the United States.  It attracts primarily male participants throughout the Atlanta area, including Clayton, Cobb, Dekalb, Fulton, and Gwinnett counties.  Male volunteer recruitment is a high priority for all CASA programs, and there is no residency requirement for volunteers.  Sponsorship allowed the program name to be listed on the team t-shirt, posted on the team banner which is displayed at every game during the ten week season (which will run through July) as well as displayed at tournaments (including Birmingham, which was held in March), and to receive three separate email acknowledgements to league members. The sponsored team is in the D- Division, which is the largest division of HSL with 19 teams.  Additionally, HSL selects an annual charity to

---

[24] The Court sustains plaintiff's objections to the remainder of DSMF ¶ 61, as Judge Teske did not know when he directed plaintiff's discharge that some of the meals plaintiff bought were for a former boyfriend, and plaintiff denies he lived in close proximity to Midtown Atlanta.  (See PR-DSMF ¶ 61.)

support with Lost N Found (Finding Safety and Shelter for Atlanta's LGBT Youth) being the chosen organization for 2013. By educating league members on what CASA is and the volunteer services needed, it will place CASA in contention for possible selection by the league next year. Providing light refreshments at an informal reception in Birmingham, allowed opportunity to speak with league members as well as other athletes about CASA and the need for volunteers, specifically male volunteers. Recruitment has been on-going. Chris Burton with AT&T has assisted Clayton County CASA and other metro Atlanta CASA programs with a marketing campaign in the Atlanta area as a result of this sponsorship. Additionally, through this effort, two individuals volunteered for the annual GA CASA Luncheon and Fashion Show held in March (Scott Legnon with Children's Healthcare of Atlanta, and Edwin Mesa, journalist with CNN). Clayton County CASA benefits from this event through state office support of Clayton County CASA volunteers by means of training, specifically pre-service metro training and also other in-service training opportunities including the annual Ga CASA conference. It is also anticipated that Dragon Con Atlanta will become a prize donor or sponsor for the 2013 Clayton County CASA Darlin' Duck Derby, and that league members will be purchasing duck derby tickets as well as assist selling them. Conversations with the Heery Corporation, which also sponsors a softball team, are also underway as a result of this sponsorship.

(Pl.'s Ex. 81 [141-24] 4-5.)[25]

--------------------------

[25] The Court quotes Mr. Bostock's lengthy written response instead of sorting out the conflicting contentions of the parties. (Compare DSMF ¶ 62, with PR-DSMF ¶ 62 & PSAMF ¶ 42.) The Court excludes DSMF ¶ 63 as unsupported by the record cited. Judge Teske's question asked Mr. Bostock to identify "any volunteers for Clayton County CASA" he had recruited from sponsoring the softball team, not "any Clayton County CASA GAL volunteers." (See PR-DSMF ¶ 63.) Similarly, the Court excludes DSMF ¶ 24. The proposed fact states: "No

Judge Teske reviewed plaintiff's written responses to his questions and then decided to terminate plaintiff because he concluded that most of the expenses from the GAL account were not being used to recruit, train, and retain Clayton County CASA GAL volunteers as required by the MOU, but rather for other purposes, such as assisting FCCC with its fundraising endeavors, which Judge Teske characterized as "taking from Peter to pay Paul." (DSMF ¶ 65.)[26]  Judge Teske also concluded that most of the expenses incurred by plaintiff using GAL funds at restaurants and bars in Atlanta were not for recruiting, training, or retaining Clayton County CASA

_____

individual ever became a Clayton County CASA GAL volunteer because of Plaintiff taking him or her out to lunch or dinner." (DSMF ¶ 24.)  However, the record cited shows that plaintiff was asked instead if he could "think of anyone today who became a CASA volunteer after taking them out to lunch or dinner?" (Bostock Dep. [132] 157.)  Plaintiff answered by stating that he "would certainly say yes" to whether anyone for whom he bought a meal became a CASA volunteer. (Id.)  Plaintiff contends that, at the Birmingham reception, he secured verbal commitments for three CASA sponsorships, but due to the timing of his termination, those commitments were not consummated. (PSAMF ¶ 43.)  Plaintiff further asserts that in at least one instance, an individual who was to begin the CASA application process did not pursue it because of plaintiff's discharge. (Id. ¶ 72.) However, plaintiff made no mention of these putative volunteers when he submitted his written response to Judge Teske's questions.

[26] The Court notes plaintiff's contention that the reasons why Judge Teske terminated him are disputed legal issues and that this proposed fact (and others that follow it) are argumentative. (PR-DSMF ¶¶ 65-69.)  However, the Court includes them here because they articulate defendant's legitimate, non-discriminatory reasons for the discharge.  The Court excludes PSAMF ¶¶ 54 through 55 as immaterial and argumentative.

33

GAL volunteers to serve miles away in Clayton County.  (Id. ¶ 66.)  Judge Teske further concluded that plaintiff's use of GAL funds to sponsor an Atlanta softball team, including the Birmingham reception, was not for recruiting, training, or retaining Clayton County CASA GAL volunteers to serve miles away in Clayton County.  (Id. ¶ 67.)  In addition, Judge Teske believed that the use of GAL funds to sponsor the softball team was a personal benefit to plaintiff in that he enhanced his credibility and prestige with team members by providing them with a T-shirt bearing the Clayton County CASA logo at no expense and a free reception in Birmingham.  (Id. ¶ 68.)

Finally, Judge Teske suspected that, because the audit found that there were a number of missing bank statements and it was incredulous to him that Mr. Bostock could be recruiting individuals in Midtown Atlanta to become CASA GAL volunteers in Clayton County, some of the restaurant and bar expenses paid for with GAL funds may have been for his own personal interest (such as meals with his softball team teammates) and not for business-related purposes.  However, even if none of the restaurant and bar expenses were incurred for his personal interest, Judge Teske believed that most of the expenses were still outside the scope of the MOU because they were not for the training, recruitment, and retention of Clayton

34

County CASA GAL volunteers.  Thus, Judge Teske contends that he would have terminated plaintiff on this ground alone.  (DSMF ¶ 69.)[27]

### K.     Judge Teske's Meeting With Ms. Crawford

Before Judge Teske directed the termination of Mr. Bostock (discussed infra), he and Mr. Slay visited the FCCC's Crawford at her car dealership.  Judge Teske told Ms. Crawford that he was going to terminate Mr. Bostock.  (PSUMF ¶ 64.) According to Ms. Crawford, Judge Teske further stated that Mr. Bostock had misused or stolen between $14,000 and $17,000 and that he had proof in the form of bank statements.  (Id. ¶ 65.)  However, Ms. Crawford subsequently modified her testimony and relayed that the Judge said Mr. Bostock "took, not necessarily stole[]" the funds.  (DR-PSUMF ¶ 65, modified per record cited.)  She added that Judge Teske told her that Mr. Bostock was using GAL funds to pay for things that he should not have been using GAL funds to pay for.  (Id.)[28]

_____

[27] The Court sustains plaintiff's objection to DSMF ¶ 70 as immaterial.  The Court also excludes DSMF ¶ 73, which concerns what Judge Teske wrote in his diary, as that topic is exhaustively covered infra.

[28] Judge Teske denies telling Ms. Crawford that Mr. Bostock stole or misused between $14,000 to $17,000.  (PR-DSUMF ¶ 65.)  He claims instead that he told her an audit of the GAL account showed that Mr. Bostock had mishandled or misused funds in the GAL account; that somewhere between $14,000 to $15,000 had been collected in the GAL account; and that a substantial amount of that fund

For example, Judge Teske told Ms. Crawford that plaintiff had used money from the GAL account to sponsor a softball team.  (PSUMF ¶ 67, modified per record cited.)  Ms. Crawford testified that she was aware of Mr. Bostock using GAL account funds to sponsor the softball team, and that no one on the FCCC board thought it was a bad idea.  (Id. ¶ 68, modified per record cited.)  According to Ms. Crawford, the FCCC board did not approve the use of GAL account funds to sponsor plaintiff's softball team because the board did not have authority to spend GAL account funds.  She understood that GAL account funds could be spent at the discretion of the director (Mr. Bostock) based on the MOU.  (Crawford Dep. [133] 27-28, 44-45, 110, 112, 155-56, 161, cited in DR-PSUMF ¶ 33.)[29]

Ms. Crawford further testified she told Judge Teske that she was in shock over his decision to fire Mr. Bostock; he replied that plaintiff was spending money at this place and that place.  (Crawford Dep. [133] 42-43.)  In Ms. Crawford's opinion, her questioning of the discharge decision apparently angered the Judge,

_____

had been expended.  (Id.)  What was said during this meeting is disputed.  The Court sustains defendant's objection to PSUMF ¶ 66 as immaterial.

[29] Mr. Bostock contends that he notified both Ms. Crawford and her fellow board member, Guy Alexander, of the sponsorship and both approved of it and thought it was a good idea.  (PSUMF ¶ 33, modified per record cite.)

leading him to slam his hand down on her desk and loudly exclaim, "But it was at a gay bar." (PSUMF ¶ 69, modified per record cited.)[30]

**L.     Plaintiff's Discharge**

On June 3, 2013, Judge Teske instructed Mr. Johnson to terminate Mr. Bostock. (PSUMF ¶ 60.) Judge Teske was the ultimate decision maker concerning the discharge. (Id. ¶ 61; see also DSMF ¶ 64.) At the meeting in which Mr. Johnson carried out the termination, Mr. Bostock told Mr. Johnson that he knew what the meeting was about, and Mr. Johnson responded, "This is not because you're gay." (PSUMF ¶ 73.) Plaintiff was not provided a copy of the Audit Report. (Id. ¶ 74.) Ms. Gossett, a gay woman, replaced plaintiff. (DSMF ¶ 74.)

**M.     Judge Teske's Diary Entries and Testimony About Them**

On June 3, the day of Mr. Bostock's discharge, Judge Teske made entries in his diary, writing as follows: "Today is not a good day. I decided to terminate Gerald Bostock, my child welfare coordinator. It turns out he has been using GAL funds that are dedicated to the recruitment of Clayton County CASA volunteers,

---

[30] Judge Teske denies that he made this comment to Ms. Crawford. (DR-PSUMF ¶ 69.) Again, this is disputed fact.

their training and retention for meals with friends (former boyfriends—he is gay)[31]

and to sponsor his softball team in a gay softball league in Atlanta." (Teske Diary,

filed as Pl.'s Ex. 43 [129-1] 10; see also PSUMF ¶¶ 45-46.)  He also recorded the

following thoughts:  "Employees told me Gerald said we do not have money—yet

he had a debit card and was buying meals for potential sponsors in Midtown

Atlanta—the gay district of Atlanta."  (PSUMF ¶ 48; see also id. ¶ 52, modified

per record cited.)  Judge Teske further wrote, "It's not the gay thing that upsets

me—it's the appearance that because he is gay he is spending money on his own

interests—that's a conflict." (Teske Diary, filed as Pl.'s Ex. 43 [129-1] 11; see also

PSUMF ¶ 51.)[32]

> Judge Teske testified as follows about his diary entries:
>
> Q    Okay.  So basically you concluded—you included in your journal that because Gerald is gay, he was spending money on his own interest, and that was a factor—
>
> A    No, that—

---

[31] Judge Teske conceded at his deposition that he had no evidence that plaintiff was having meals with former boyfriends. (PSUMF ¶ 47.) The audit also did not show that Mr. Bostock was doing that. (Id. ¶ 49.)

[32] On May 31, 2013, Judge Teske made a similar observation, writing in his diary that the internal audit had shown that Mr. Bostock "did a number of things, including sponsoring his gay softball team in a gay Atlanta softball league.  It's not the 'gay' aspect of it, but the personal gain."  (Teske Diary, filed as Pl.'s Ex. 43 [129-1] 10.)

Q      —in your decision to terminate him; right?

A      That I was very suspicious that that's what was going on because he could not account for all the spending, and because it was that locale, which would be unique to him in that sense, and it's in Atlanta on top of that.  And it's incredulous that he could be recruiting people in Atlanta to come down to Clayton County.  All those number of things together in its totality of circumstances is what creates the more likely than not.

Q      So it's an assumption that—there is an assumption that because he is recruiting in Midtown that he is actually engaging in gay-related activity, and not serious CASA-related activity.  That was your assumption; right?

          . . .

A      Yeah.

Q      Is that a yes?

A      I'm highly—yeah, I'm highly suspicious that he's up there doing personal, more so personal than business stuff.

Q      And by personal, you mean gay stuff; right?

A      Well, it—you know, it—here's the thing, it doesn't matter whether you're gay, you're straight.  What makes it suspicious that it was personal is because he is gay and he was in that venue, and spending money in the GAL account in that venue, which he could not account for all of the spending.

Q      And that was a contributing factor in your decision to terminate him; right?

A      It was a contributing factor, okay.

39

Q     Okay.

A     All of those factors together in its totality.

Q     Okay.  So in your—in your diary in the section that involves Gerald's termination, you use the word gay one, two, three, four, five, six, seven, eight times; right?

A     Yes.

Q     His sexuality was heavy on your mind?

        . . .

Q     Eight times; right?

A     Yes.  Of which, if I may say, that some of those times is to expressly state it's not because he's gay, but for other reasons.

        . . .

Q     [Mr. Bostock's] sexuality was part of the reason that you drew the conclusions that are mapped out in your diary; correct?

A     It was the connection between the fact that he is gay, and it's in Midtown and so far away, he's claiming he's doing business there, that it's incredulous that he could do the type of business that's required in that—restricted in the MOU.  It's all those factors together. So if he's not there doing business, what else is he doing?  It begs the question.

Q     So it must have been doing gay things?

A     I wouldn't phrase it that way.

Q     But that's kind of what you're saying, isn't it?

40

A       No— . . . it would be that he's doing personal things.

Q       Well, why, why if he's just doing personal things would you pepper your journal entry about the reason you're firing with the fact that he's gay?

A       Because it's the relationship between that and the venue where the money was spent.

Q       The venue being a gay venue?

A       Yes.

(Teske Dep. [182] 177-79, 181-82, cited in PSUMF ¶¶ 53-54, 62-63.)

## N.       Judge Teske Meets with Court Staff

Judge Teske held a meeting with the Juvenile Court staff to notify them of Mr. Bostock's termination.  (PSUMF ¶ 70.)  One of the employees present at that meeting, Shelly Johnson, testified that Judge Teske relayed to them that Mr. Bostock was terminated because he misappropriated funds in sponsoring the gay softball team and that the court would not tolerate that type of behavior.  (Id. ¶ 71.)[33]  Judge Teske asserts that plaintiff's use of GAL funds to support his softball

———————————

[33] Mr. Johnson found the calling of this meeting and the discussion with the staff to be inappropriate because personnel matters are usually confidential. (PSUMF ¶ 72.)  Judge Teske asserted that he called the meeting because news of the termination would be on local television that evening and he did not want the staff to be surprised.  (DR-PSUMF ¶ 72.)

41

team was not the only example of financial mismanagement that he mentioned during the meeting.  (DR-PSUMF ¶ 71.)[34]

## II.   SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Those

---

[34] Plaintiff points to the testimony of Ms. Moore, who stated that the only other person she was aware of who was terminated as a result of an audit was an individual who stole money, which plaintiff did not do.  (PSAMF ¶ 74.)  The County responds that the wrongdoers in subsequent Juvenile Court audits were not terminated because Juvenile Court administration concluded that (1) grant funds were being properly applied to the employees and positions identified in the audits identified by Mr. Bostock; (2) one of the audits identified by plaintiff addressed the actions of a former employee (who could not be terminated); (3) another audit and related email identified by plaintiff addressed the need for the new Child Welfare Coordinator to reconcile bank statements on a monthly basis; and (4) the remaining audits identified by plaintiff addressed issues relating to the first year of a grant. (DSMF ¶ 75.)  Because comparator evidence is not necessary given the recommendations in this case (discussed infra), the Court need not tarry over facts related to the other audits.

materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate. Rice-Lamar, 232 F.3d at 840. "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." Id. (citing Anderson, 477 U.S. at 255).

43

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried. Anderson, 477 U.S. at 250. The applicable substantive law will identify those facts that are material. Id. at 248. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. For factual issues to be "genuine," they must have a real basis in the record. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial." Id. at 587.

III. **DISCUSSION**

Plaintiff sued defendant for sexual orientation discrimination under Title VII. This statute makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of, inter alia, such individual's sex. 42 U.S.C. § 2000e-2(a)(1). The Supreme Court held in Bostock v. Clayton County, Georgia, that an employer illegally discriminates against an individual because of such individual's

44

sex if it makes an adverse employment decision based on sexual orientation. 590 U.S. ___, ___, 140 S. Ct. 1731, 1741, 1743 (2020).[35]

"Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016).[36] Mr. Bostock alleges both claims here. (Third Am. Compl. [101] ¶¶ 6, 31.)

A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias . . . 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." Quigg, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)). "In contrast, single-motive claims—which are also known as 'pretext' claims—require a showing that bias was the true reason for the adverse

_____

[35] When this case was initially filed, binding Eleventh Circuit precedent required the undersigned to recommend dismissal of Mr. Bostock's Title VII sexual orientation discrimination claim. See Bostock v. Clayton Cty., No. 1:16-CV-01460-ODE-WEJ, 2016 WL 9753356 (Nov. 3, 2016). The presiding United States District Judge adopted that Report and Recommendation, see Bostock v. Clayton Cty., 2017 WL 4456898 (July 21, 2017), and the Eleventh Circuit affirmed. See Bostock v. Clayton Cty. Bd. of Comm'rs, 723 F. App'x 964 (11th Cir. 2018) (per curiam). The United States Supreme Court reversed and remanded. See Bostock, 590 U.S. at ___, 140 S. Ct. at 1754.

[36] Although Quigg noted that mixed-motive and single-motive discrimination are different theories of discrimination as opposed to distinct causes of action, it nonetheless referred to them as separate claims. 814 F.3d at 1235 n.4. That happens here as well.

45

action."  Id.; see also Fonte v. Lee Mem'l Health Sys., No. 20-13240, 2021 WL 5368096, at *4 (11th Cir. Nov. 18, 2021) (per curiam) ("A plaintiff who asserts a single-motive discrimination claim can survive a motion for summary judgment by showing that illegal bias was the *only* reason for the adverse employment action.").

"Single-motive and mixed-motive discrimination claims can be established with either direct or circumstantial evidence." Quigg, 814 F.3d at 1235 (citing Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-102 (2003)).  Direct evidence is evidence proving, without inference, that illegal reasons motivated an adverse employment action.  See Wilson v. B/E Aerospace, 376 F.3d 1079, 1086 (11th Cir. 2004).  Circumstantial evidence is indirect evidence.  Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012).  Circumstantial evidence "'suggests, but does not prove, a discriminatory motive.'"  Quigg, 814 F.3d at 1236 (quoting Wilson, 376 F.3d at 1086).

Regardless of whether a plaintiff proceeds under the single-motive or mixed-motive theory of discrimination, the Eleventh Circuit cautions as follows:

> "[O]ur sole concern is whether unlawful discriminatory animus motivated the decision." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (cleaned up).  "We do not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." Id. (quotation marks omitted).  Thus, "an

46

employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). "And, in carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law." E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176-77 (11th Cir. 2000).

Williams v. Hous. Auth. of Savannah, Inc., 834 F. App'x 482, 488 (11th Cir. 2020) (per curiam).

Both parties have filed motions for summary judgment. Given the standards applicable to such motions (stated supra Part II), the Court must construe the evidence in a light most favorable to the non-moving party on each motion. For ease in that analysis, the Court addresses the motions separately below.

**A.      Plaintiff's Motion for Summary Judgment**

Mr. Bostock seeks entry of summary judgment in his favor on two grounds. First, with regard to his single-motive claim, plaintiff contends that Judge Teske's diary entries and his testimony about them constitute direct evidence of discrimination (i.e., they show that his discriminatory animus was the "but for" cause of his discharge). (Pl.'s Mem. [127-1] 13-22.) Second, with regard to his mixed-motive claim, plaintiff asserts that Judge Teske's diary entries and testimony

47

about them show that plaintiff's sexuality was a motivating factor in his discharge. (Id. at 22-24.)

Defendant rejects those contentions, asserting that there is no direct evidence supporting plaintiff's single-motive claim, but even if there were, arguing that a reasonable jury could find that Judge Teske would have made the same decision in the absence of any discriminatory animus. (Def.'s Opp'n [154] 4-18.) With regard to plaintiff's mixed motive claim, defendant takes plaintiff to task for providing "virtually no argument for why he believes he is entitled to summary judgment on establishing a mixed motive claim." (Id. at 19-24.)

### 1. Alleged Direct Evidence Supporting Plaintiff's Single-Motive Claim

As noted above, plaintiff asserts that he has direct evidence of discrimination supporting his single-motive claim from the testimony of Judge Teske and his diary excerpts. Direct evidence is that which reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Damon, 196 F.3d at 1358 (internal quotations marks and citation omitted). The statement claimed to constitute direct evidence must prove discrimination "'without inference or presumption.'" Wilson, 376 F.3d at 1087 (quoting Burrell v. Bd. of Trs. of Ga. Mil. Coll., 125 F.3d 1390, 1393 (11th Cir.

1997)).  Due to the "powerful" nature of direct evidence, the Eleventh Circuit has marked severe limits for the kind of language that may be treated as direct evidence of discrimination.  Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (per curiam).  Only the most blatant remarks, whose intent could be nothing other than to discriminate based on a protected classification, constitute direct evidence of discrimination.  Scott v. Suncoast Bev. Sales, Ltd., 295 F.3d 1223, 1227 (11th Cir. 2002).  Evidence that is subject to more than one interpretation does not constitute direct evidence.  Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999).  If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.  Burrell, 125 F.3d at 1393-94.

A couple of cases show the high standard applicable to direct evidence.  In Damon, the Circuit wrote as follows:

> The most probative piece of alleged direct evidence cited by Appellants is a comment by Soto to Dennis D'Angelo, [plaintiff] Kanafani's replacement, immediately after Kanafani's termination that "what the company needed was aggressive *young* men like [D'Angelo] to be promoted."  While the statement was made right after Kanafani's termination, and it was made by Soto, the decision-maker, to Kanafani's younger replacement, the comment does not amount to direct evidence of discrimination.  Though probative circumstantial evidence of Soto's state of mind, the comment still requires us to *infer* that Soto's interest in promoting young men motivated his decision to terminate Kanafani.

49

<u>Damon</u>, 196 F.3d at 1359 (footnote omitted).

Similarly, in <u>Quigg</u>, the plaintiff argued that she had direct evidence of discrimination motiving the board of education's vote not to renew her employment contract. 814 F.3d at 1242 n.11. Three members of the board made the following comments: (1) Nesmith told a parent that "it is time to put a man in there"; (2) Morgan and Nesmith recommended to Quigg that she hire a tough "hatchet man" to serve as assistant superintendent; (3) Morgan said to Quigg that she should consider a male assistant superintendent because it is important to achieve gender balance in the school administration; and (4) Hiers commented shortly after the non-renewal vote that she voted against Quigg because Quigg "needed a strong male to work under her to handle problems, someone who could get tough." <u>Id.</u> at 1241. The Eleventh Circuit held that none of those statements met the high standard necessary to constitute direct evidence:

> Although each statement indicates a desire for a male presence in the superintendent's office, the statements all require inference to reach the conclusion that the Board members voted against Quigg based on her sex or gender. Nesmith's "it is time we put a man in there" statement is illustrative. It is unclear whether this statement referred to the proposed assistant superintendent position, the office of the superintendent generally, or Quigg's position. If the latter, the statement would clearly be direct evidence. But, a presumption or inference is required to conclude the statement referred to Quigg's position, and if it referred to the proposed assistant superintendent

50

position or the office of the superintendent generally, it only shows a desire to have a male presence in the office of the superintendent. Such a desire does not necessarily lead to the conclusion that Nesmith wanted to remove Quigg–Nesmith may have wanted Quigg and a male to serve in the office of the superintendent together, with Quigg retaining her position.   Thus, some presumption is required for the statement to be considered proof that Nesmith discriminated against Quigg based on her sex or gender.

Id. at 1242 n.11.

In contrast, the Eleventh Circuit found direct evidence of discrimination in the following illustrative cases:  E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 922, 923-924 (11th Cir. 1990) (decisionmaker's statement that "if it were his company, he wouldn't hire any black people" constituted direct evidence of discrimination); E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 & n.3, 1070 & n.6 (11th Cir. 1990) (frequent, flagrant, revolting, and insulting racially derogatory remarks toward and in the presence of black employees by plant manager and other supervisors, including frequent use of the N word, constitute direct evidence of racially hostile working environment); and Miles v. M.N.C. Corp., 750 F.2d 867, 876 (11th Cir. 1985) (racial slur uttered by the person in charge of making employee evaluations and rehiring suggestions constituted direct evidence of discrimination).

These three illustrative cases suggest that direct evidence of discrimination would be testimony showing, for example, that Judge Teske said, "I fired Mr. Bostock because he is gay," or evidence revealing that Judge Teske made derogatory remarks about gays.  There is no such evidence in the record.  In other words, there is no evidence that Judge Teske is a homophobe.  Instead, the record shows that Judge Teske knew for many years that plaintiff is gay, socialized often with him and his partner, invited plaintiff and his partner to his daughter's wedding, advocated on behalf of LBGTQ youth, and wrote in his diary that his problem with plaintiff was not his sexual orientation but rather his spending from the GAL account in locations and ways the Judge considered outside the parameters of the MOU.

Judge Teske's diary entries and his testimony about them are not direct evidence of discrimination, because they do not prove discrimination without inference or presumption.  Wilson, 376 F.3d at 1087.  One must infer that Judge Teske did not mean what he said in his diary (which was private and not intended for disclosure) when he disclaimed an anti-gay motive.  Or, one must presume that Judge Teske was not actually concerned about where and how plaintiff was spending GAL funds in contravention of the MOU, but was actually motivated by

52

animosity toward gay individuals.[37]  Thus, the undersigned reports that plaintiff is not entitled to summary judgment in his favor on his single motive sex discrimination claim because of direct evidence.

Nevertheless, even if one could find that Judge Teske's diary and his testimony about it constitute direct evidence, there is still another step in the analysis.  "A defendant presented with direct evidence of discrimination can rebut the presumption that the [employment] decision was improperly motivated only by proving by a preponderance of the evidence that the same decision would have been reached even absent the impermissible factor."  Wilson v. City of Aliceville, 779 F.2d 631, 634 (11th Cir. 1986); see also Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2008) (per curiam) ("In the face of direct evidence, an employer must prove that the same employment decision would have been made absent any discriminatory intent.") (quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)); Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020) ("Where a case of discrimination is proven by direct evidence, the burden shifts to the defendant to prove 'by a preponderance of the

_____

[37] Another example of Judge Teske's lack of animus is seen in his selection of a gay individual to replace plaintiff.

evidence that the same decision would have been reached even absent the presence of the discriminatory motive.'") (quoting <u>Miles</u>, 750 F.2d at 875-76)).

Construing the evidence in a light most favorable to the County as the non-moving party, a reasonable jury could find that Judge Teske can rebut the presumption that the employment decision was improperly motivated and that he would have reached the same decision even absent a discriminatory motive. Although plaintiff disputes the County's position, a reasonable jury could credit Judge Teske's assertion that he believed plaintiff spent GAL funds in contravention of the limitations of the MOU.  He saw significant expenses for food and beverages at establishments and in locations (Midtown Atlanta and Birmingham) that he believed would not  (and did not) yield CASA GAL volunteers down in Clayton County.   The jury might agree with Judge Teske that plaintiff made these expenditures for his own personal benefit.  Moreover, the audit showed that there was a factual basis for some of Judge Teske's concerns.[38]  In sum, there are disputed issues of material fact which preclude the undersigned from

---

[38] Although plaintiff claims several times in his various briefs that the audit was instituted as a direct result of his joining the HSL, there is no probative evidence to support that contention.  As discussed <u>supra</u>, several legitimate factors led to the audit.  There is also no probative evidence that the auditors were biased against plaintiff.

recommending that plaintiff's Motion for Summary Judgment be granted on his single-motive sex discrimination claim.

## 2.    Plaintiff's Mixed Motive Claim

A plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the employer took an adverse employment action against him; and (2) a protected characteristic was a motivating factor for the employer's adverse employment decision.  Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1364 (11th Cir. 2018); see also Gosa v. Wal-Mart Stores E., LP, Civ. No. 16-0055-CG-B, 2017 WL 457198, at *8 (S.D. Ala. Feb. 2, 2017) (second factor of a mixed-motive claim requires a court to determine whether a plaintiff has presented sufficient evidence for a reasonable jury to conclude that his protected characteristic was a motivating factor for an adverse employment decision).  "The test, therefore, is more lenient for a plaintiff than that required to bring a single-motive claim." Kingsley v. Tellworks Commc'ns, LLC, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *30 (N.D. Ga. May 24, 2017), R. & R. adopted, 2017 WL 2619226 (N.D. Ga. June 15, 2017).[39]

---

[39] "The McDonnell Douglas framework applies to only 'single-motive' claims based on circumstantial evidence."  White v. Winn Dixie, 741 F. App'x 649,

"If the employee can show that an unlawful reason was a motivating factor, then the burden shifts to the employer to show that it would have made the same decision in the absence of the impermissible motivating factor." Bartels v. S. Motors of Savannah, Inc., 681 F. App'x 834, 840 (11th Cir. 2017) (per curiam); see also Huff v. Birmingham City Schs., No. 2:17-CV-02007-JEO, 2019 WL 498984, at *5 n.11 (N.D. Ala. Feb. 8, 2019) ("The 'same decision defense' is used by Defendants to counter a mixed-motive discrimination claim.").

In this case plaintiff meets element one:  It is undisputed that his employer took an adverse employment action against him.  As for element two, plaintiff points to the Judge Teske deposition testimony, which he construes as an admission by the Judge that plaintiff's sexuality was a "contributing factor" in the discharge decision.  Assuming that a "contributing factor" is the same as a "motivating factor," plaintiff arguably meets element two.  However, the County raises a triable issue over whether it can show that Judge Teske would have made the same decision in the absence of the impermissible motivating factor. Bartels, 681 F. App'x at 840. As discussed supra in the direct evidence section, although plaintiff disputes

_____

656 n.2 (11th Cir. 2018) (per curiam).  It is not to be applied in mixed-motive claims. Id.

defendant's position, viewing the facts in the light most favorable to defendant, Judge Teske believed that plaintiff spent GAL funds in contravention of the limitations of the MOU.  Moreover, the audit showed that there was a factual basis for some of Judge Teske's concerns.  In sum, there are disputed issues of material fact which preclude the undersigned from recommending that plaintiff's Motion for Summary Judgment be granted on his mixed-motive sex discrimination claim.

**B.  Defendant's Motion for Summary Judgment**

Defendant also moves for summary judgment on plaintiff's single-motive and mixed-motive discrimination claims.  As before, the Court analyzes them separately below.

**1.  Plaintiff's Single-Motive Claim**

**a)  Background**

"In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in h[is] favor." Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). In a single-motive claim, a plaintiff may present sufficient facts to permit a jury to rule in his favor in multiple ways:  (1) by introducing direct evidence of discriminatory intent; (2) by satisfying the familiar burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973); or (3) by

demonstrating a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination set out in Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  See Lewis, 918 F.3d at 1220 & n.6; see also Williams v. Hous. Opportunities for Persons with Exceptionalities, 777 F. App'x 451, 454 (11th Cir. 2019) (per curiam) (holding that McDonnell Douglas and Lockheed-Martin are alternative frameworks for analyzing circumstantial evidence in single-motive claims).

Mr. Bostock proceeds down all three lanes here.  (Pl.'s Resp. [157] 3-20.) As discussed supra in relation to plaintiff's Motion for Summary Judgment, there is no direct evidence of discrimination here.  However, as shown below, plaintiff has raised a triable issue on his single-motive sex discrimination claim under Lockheed-Martin's convincing mosaic; thus, there is no need to address the McDonnell Douglas framework.

### b)      **Lockheed-Martin's Convincing Mosaic**

"[E]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  Lockheed-Martin, 644

F.3d at 1328.[40]  Rather, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id.  The court explained that "[a] triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  Id. (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 733 (7th Cir. 2011)).

In Lockheed-Martin, the Eleventh Circuit found a convincing mosaic because the defendant had an extensive and documented history of disparate treatment of African-American employees and the defendant's disciplinary review committee relied upon a spreadsheet that listed the race of several employees.  644 F.3d at 1328.  Similarly, in Lewis, the en banc Eleventh Circuit held that a "convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2)

---

[40] "In other words, this 'convincing mosaic' method is a totality of the circumstances analysis that is not subject to the formalities of the McDonnell Douglas test."  Banks v. MarketSource, Inc., No. 1:18-CV-02235-WMR, 2020 WL 6291422, at *7 (N.D. Ga. Mar. 20, 2020).

systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis, 934 F.3d at 1185 (internal quotation marked omitted).

Although the undersigned has noted the lack of direct evidence showing that Judge Teske fired Mr. Bostock simply because he is gay or that he made disparaging comments about gay individuals, Judge Teske's diary entries and his testimony about them, construed in a light most favorable to plaintiff, constitute circumstantial evidence that he was very focused on plaintiff's sexuality. Judge Teske wrote that plaintiff is gay eight times in a short diary excerpt.[41] He called Midtown Atlanta the "gay district." Judge Teske's testimony can even be interpreted as stating that plaintiff's sexual orientation was a "contributing factor" in the termination decision. Judge Teske also assumed that because plaintiff is gay and was spending GAL funds in some establishments that catered to a primarily gay clientele, he was obtaining a personal benefit. Crediting Ms. Crawford's testimony at this stage, Judge Teske revealed that his concern arose because plaintiff was spending GAL funds in gay bars. A reasonable jury could conclude

--------------------

[41] This many uses of the word "gay" undermines the County's contention that Judge Teske was simply making a legitimate recognition of plaintiff's sexual orientation. (Def.'s Mem. [138-6] 22.)

that, while Judge Teske may not be a homophobe, plaintiff's spending in gay bars in Midtown Atlanta was a bridge too far for the Judge.  Finally, crediting plaintiff's evidence about the meeting in which Judge Teske announced plaintiff's discharge to the staff, a reasonable jury could conclude that his assertion that the court would not tolerate Mr. Bostock's misappropriation of funds to sponsor a gay softball team reflected discriminatory animus.

"A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination."  Hamilton, 680 F.3d at 1320.  The undersigned reports that enough circumstantial evidence of discrimination exists here for plaintiff's single-motive sex discrimination claim to survive summary judgment.  See Robinson v. City of Atlanta, No. 1:10-CV-02036-AT-AJB, 2012 WL 12836657, at *11 (N.D. Ga. July 27, 2012), R. & R. adopted, 2012 WL 12835876 (N.D. Ga. Aug. 31, 2012) (denying motion for summary judgment using convincing mosaic framework where evidence showed that decision maker referred to plaintiff as an angry black woman twice in months leading up to her termination).  As was the case in Smith, Judge Teske's "injection of [plaintiff's sexuality] into [his] decision-making process yields an unavoidable inference that [Mr. Bostock's sexuality] impacted the discipline determination, and it is a jury's province to

61

decide whether [sexuality] actually bore on the decision to terminate [plaintiff]." 644 F.3d at 1346.

### C.    Plaintiff's Mixed-Motive Claim

To avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence (i.e., direct or circumstantial) sufficient to convince a jury that: (1) the employer took an adverse employment action against him; and (2) a protected characteristic was a motivating factor for the employer's adverse employment decision.  Bowen, 882 F.3d at 1364; see also Gosa, 2017 WL 457198, at *8 (second factor of a mixed-motive claim requires a court to determine whether a plaintiff has presented sufficient evidence for a reasonable jury to conclude that his protected characteristic was a motivating factor for an adverse employment decision).  "If the employee can show that an unlawful reason was a motivating factor, then the burden shifts to the employer to show that it would have made the same decision in the absence of the impermissible motivating factor."  Bartels, 681 F. App'x at 840.

Just as the undersigned could not recommend entry of summary judgment for plaintiff on this claim, it also cannot recommend entry of summary judgment for defendant.  Plaintiff has shown that the County took an adverse employment action against him; and that evidence can be construed to suggest that a protected

characteristic was a "contributing factor" in Judge Teske's discharge decision. Moreover, construing the facts in a light most favorable to plaintiff, the County has not carried its burden of showing that Judge Teske would have made the same decision in the absence of the impermissible motivating factor. A jury could ultimately conclude that the County can carry that burden, but given the material factual disputes here, the undersigned cannot recommend foreclosing this claim at this stage of the case.

## IV.   CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [127] be **DENIED**, and that Defendant's Motion for Summary Judgment [136] be **DENIED**. A jury should resolve the disputed issues of material fact presented here.

The Clerk is **DIRECTED** to terminate the reference to the Magistrate Judge.

Given the disputed facts here, the parties are encouraged to mediate this matter, either using a private mediator or a Magistrate Judge of this Court.

**SO RECOMMENDED**, this 7th day of June, 2021.

_Walter E. Johnson_
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

63